AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Western District of Arkansas
### El Dorado Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWITTER ACCOUNT **@marcoguirlando** THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. | Case No.    1:18cm11 |

**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Aug 3, 2018

OFFICE OF THE CLERK

**Filed Under Seal**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*:
**See "Attachment A"**

located in the Western District of Arkansas there is now concealed *(identify the person or describe the property to be seized)*:
**See "Attachment B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement |
| 18 U.S.C. § 2252A(a)(2) | Receipt or Distribution of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of, or Accessing, Child Pornography |

The application is based on these facts:   See attached Affidavit of SA Robert Coleman, FBI.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
Robert Coleman, Special Agent, FBI

Sworn to before me and signed in my presence.

Date:   8-3-18

_____
*Judge's signature*

City and state:   Texarkana, Arkansas

_____
Barry A. Bryant, United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
TWITTER ACCOUNT **@marcoguirlando**
THAT IS STORED AT PREMISES
CONTROLLED BY TWITTER INC.

Case No.

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Robert Coleman, a Special Agent with the Federal Bureau of Investigation, (FBI),

being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Twitter account that is stored at premises owned,

maintained, controlled, or operated by Twitter, Inc., a social-networking company headquartered

in San Francisco, California (hereinafter "Twitter"). The information to be searched is described

in the following paragraphs and in Attachment A. This affidavit is made in support of an

application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)

to require Twitter to disclose to the government records and other information in its possession,

pertaining to the subscriber or customer associated with the Twitter account.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

been since June of 2016. Prior to that, I was a narcotics agent with the Mississippi Bureau of

Narcotics and a police officer with the Gulfport, Mississippi Police Department. I attended the

University of Mississippi in Oxford, Mississippi and obtained a Bachelors of Arts degree in

Political Science.  I am currently assigned as a Special Agent with the Federal Bureau of Investigations at the El Dorado, Arkansas resident agency. My primary duties are to conduct various criminal investigations to include violent crimes against children involving human trafficking, enticement, child prostitution, and production of child pornography. I have had the opportunity to assist with observing and reviewing examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media and cellular devices. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, and I am authorized by the Attorney General to request a search warrant.

3.      The facts and statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training and background as a law enforcement officer and Special Agent with the FBI.  Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.  The communications described herein are not intended as exact transcripts, but are intended to accurately summarize the nature of the communications between the persons identified.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that MARCO GUIRLANDO committed violations of 18

U.S.C. § 2422(b) (persuasion, inducement, enticement or coercion), 18 U.S.C. §§ 2252A(a)(2) (receipt of child pornography), and 2252A(a)(5)(B) (possession of, or accessing, child pornography), and that evidence of these violations, as described in Attachment B, is located on the account described in Attachment A. There is also probable cause to search the account described in Attachment A for evidence, instrumentalities, contraband or fruits of the above-listed crimes, as is further described in Attachment B.

## **PROBABLE CAUSE**

5.     On February 5, 2018, the Warren Police Department, in Bradley County, Arkansas, was contacted in reference to a sexual assault report. The complainant stated that his daughter, A.B., currently fifteen years old, had been sexually assaulted by MARCO GUIRLANDO. Warren Police Department Investigator Tim Nichols initiated an investigation regarding the complaint.

6.     Investigator Nichols also contacted A.B.'s mother, in reference to the complaint.   Being a minor, A.B. obtained the cellular phones she used from her mother. Investigators later discovered, through searches of those phones (both Apple iPhones) and from statements made by A.B., that A.B. had used those iPhones to communicate with GUIRLANDO up until they were seized in connection with this investigation.   A.B.'s mother also paid for the cellular service on one of those iPhones during that period (the second iPhone did not have cellular service, but could still be used to communicate over wireless internet (WiFi) connections).   After receiving the mother's consent to interview A.B., and to search the phone in A.B.'s possession, Investigator Nichols responded to the Warren High School to interview A.B. in reference to the complaint.

7.      A.B. advised Investigator Nichols that she was introduced to GUIRLANDO, a then 21-year-old resident of Louisiana, during the Pink Tomato Festival in Warren, Bradley County, Arkansas, in the summer of 2017, when A.B. was 14 years old.  The Bradley County Pink Tomato Festival occurs yearly on the second full weekend in June.[1]  GUIRLANDO and A.B. met on several occasions thereafter in Bradley County, and interacted while she was 14 years old, including sexual intercourse while she was 15 years old.  A.B. further stated that, on several of those occasions, she and GUIRLANDO met at the Economy Inn hotel in Warren, Arkansas, where they engaged in consensual sexual activity and exchanged nude photographs, including nude photographs of A.B.

8.      Investigator Nichols also obtained A.B.'s iPhone (the one that had active cellular service) and searched it pursuant to her mother's consent.  In so doing, Investigator Nichols observed multiple text messages exchanged between GUIRLANDO and A.B. A.B. acknowledged the contact name listed as, "M" was a telephone number utilized by GUIRLANDO.  The text messages contained sexual conversations and nude photographs. Recent messages described GUIRLANDO's intent to meet A.B. in Warren, Arkansas, and instructed A.B. to lie about GUIRLANDO's age. Partially nude photographs also observed on A.B.'s cell phone depicted GUIRLANDO and A.B. together at the time the pictures were taken. A.B. told investigators that, during the period in which she had been involved with Guirlando, she knew him to use an Apple iPhone 6 cellular device and a second unknown cellular device, which he seldom used due to water damage.

---

[1] This information was obtained on the Bradley County Pink Tomato Festival website;
http://www.pinktomatofestival.com/

9.    A further review of A.B.'s iPhone by Investigator Nichols revealed that GUIRLANDO was currently monitoring A.B.'s location in real time.   That feature was deactivated, at which time GUIRLANDO sent a text message to A.B.'s iPhone that read, "I don't like when you disappear without telling me where you're going or what you're doing".

10.   Shortly thereafter, A.B.'s mother learned that A.B. was in possession of a second iPhone which A.B. had obtained from her mother's home.   That device was also turned over to investigators, and A.B.'s mother also consented to the search of that iPhone.

11.   Investigator Nichols later received documentation voluntarily provided by the Economy Inn in Warren, Arkansas, showing that GUIRLANDO purchased two rooms at the hotel for January 13-14, 2018 and January 14-15, 2018.

12.   On February 7, 2018, Investigator Nichols applied for a warrant for GUIRLANDO's arrest on the charge of Sexual Assault in the Fourth Degree, under Ark. Code Ann. § 5-14-127, based upon GUIRLANDO's sexual activity with A.B. in Bradley County, Arkansas, as described herein.   A.C.A. § 5-14-127 criminalizes, among other things, sexual intercourse and sexual contact by a person 20 years old or older, with a person who is less than 16 years old and not the actor's spouse.

13.   On February 20, 2018, the Louisiana Tech Police Department located GUIRLANDO in Ruston, Louisiana, and arrested him on the above-described warrant.   At the time of his arrest, GUIRLANDO was in possession of an Apple iPhone SE (hereinafter the "DEVICE").   After his arrest, GUIRLANDO was temporarily detained at the Lincoln Parish Detention Center in Ruston, Louisiana.   The DEVICE along with other unrelated personal property was secured in GUIRLANDO's Louisiana Tech Police Department personal property during that time.

14.     On February 23, 2018, GUIRLANDO was released by the Lincoln Parish Detention Center to the Warren Police Department. Investigator Nichols also received GUIRLANDO's personal property, including the DEVICE, from the Louisiana Tech Police Department by mail. The DEVICE was then secured and stored at the Warren Police Department, pending an application for a search warrant.

15.     On March 9, 2018, Investigator Nichols relinquished custody of the DEVICE to SA Robert Coleman, pending an application for a warrant to search it.

16.     On March 9, 2018, at approximately 4:00 P.M., I reviewed the content of A.B.'s iPhones pursuant to the signed parental consent to search forms. I am aware of the appearance of GUIRLANDO and A.B. based on driver's license photographs and photographs of A.B. and GUIRLANDO shown to me by Investigator Nichols. I observed numerous photographs of A.B. and GUIRLANDO partially clothed, still videos of A.B. fully nude, photographs of A.B. nude with blood appearing from her vaginal area. I also recovered numerous photographs of sexually explicit text messages exchanged between A.B. and GUIRLANDO. During an exchange of text messages, a nude photograph depicted A.B. standing in a shower wearing a sports bra and wearing no panties with blood flowing from the vaginal area. A.B. was facing away from the camera with a side of the face exposed while standing in a corner of the shower. The photograph had been sent by A.B. to GUIRLANDO via text message. Furthermore, the nude videos depicted A.B. fully nude standing in front of a bathroom mirror revealing the entire nude body that were sent by A.B. to GUIRLANDO via Marco Polo application.

17.     The following is an excerpt of a text message conversation I observed on one of A.B.'s iPhones, between GUIRLANDO and A.B., which began on February 4, 2018. The

telephone number with which A.B. was communicating during this conversation is saved in her

iPhone as a contact labeled "M." A.B. identified the contact "M" as being for Marco Guirlando.

GUIRLANDO: What are you doing

A.B.: Just put a towel on my head

A.B.: Finna put a tampon in my vagiana

GUIRLANDO: Why not a pad

GUIRLANDO: I thought you said tampons are only for when you're going out

A.B.: Bc I like to sleep with my legs open

A.B.: It can be for anything bc with a pad the blood can leak and get everywhere but with

a tampon it don't come out it just gets suck up

GUIRLANDO: Ohh I'm learning so much about girly stuff

A.B.: You want me to show you

GUIRLANDO sends his current location via text message

GUIRLANDO: Yes

A.B.: I've never done this before with some

A.B.: This is gonna be exciting

GUIRLANDO: Good

A.B.: It's on snap

A.B.: I can't believe I did that

A.B.: Don't watch it

A.B.: Hello

GUIRLANDO: Can you send me that video I watched it about 20 times that's why It

took me a while to reply

A.B.: I didn't save it

A.B.: You have access to all my nudes anyways

GUIRLANDO: Don't worry it was so cool I've never seen anything like that imam save it another way

A.B.: No don't save it

GUIRLANDO: It was so interesting like that's surprising I'm cool to me how you just pop it in there like that I never knew

GUIRLANDO: I've never even asked for this or have a girl explain this to me

GUIRLANDO: I thought you shoved it in there with your hand

A.B.: No!!

A.B.: What did you think it looked like

GUIRLANDO: I had no idea but your pussy was really pretty in the video to

A.B.: Aw thanks

GUIRLANDO: Like it made me want to give it a kiss not eat it out just a single kiss because it seemed like a lady that was upper class and deserved respect not some make out session just a single kiss on the lips and then I wave goodbye like I wanted to respect it it was so attractive and elegant

A.B.: (Sent multiple smile face pictures)

A.B.: I'm gonna work on my essay brb

GUIRLANDO: Take your time princess I'll be here when you finish

18.    On March 12, 2018, A.B. was interviewed by FBI Child/Adolescent Forensic Interviewer Janette Michaels. The interview was conducted at the Warren High School. The following disclosures were made by A.B. in reference to the incident:

19.     After they first met, A.B. and GUIRLANDO used their cellular phones to communicate via text message and social media platforms, including Snapchat, Instagram, Twitter, and Marco Polo.   Following a series of communications, A.B. asked for GUIRLANDO's Snap Chat username.  A.B. identified the contact "M" in A.B.'s iPhone to be a telephone number utilized by GUIRLANDO.

20.     A.B. stated she and GUIRLANDO later began interacting in person. A.B. advised she would sneak out of the house and GUIRLANDO would drive to Arkansas to pick her up. A.B. advised she would communicate with GUIRLANDO via cellular device, by use of multiple communication platforms previously described, and tell him to come pick her up. Their first meeting occurred in late summer of 2017.  A.B. and GUIRLANDO met in different locations, including Monticello and Warren, Arkansas. A.B. stated GUIRLANDO was aware she attended Warren High School because she would share essay assignments with GUIRLANDO.  A.B. stated she was aware GUIRLANDO was twenty-one years of age when he bought alcohol.  A.B. then confirmed GUIRLANDO's age when she asked to see his driver's license. A.B. stated GUIRLANDO later instructed A.B. what to tell law enforcement if questioned about their relationship.

21.     A.B. stated she and GUIRLANDO continued to hide their relationship and met on multiple occasions in Arkansas.  A.B. was aware GUIRLANDO was a student at an unknown school and was pursuing a Psychology degree. A.B. advised she and GUIRLANDO discussed a future together.

22.     A.B. further described multiple occasions in which she and GUIRLANDO interacted in person. After developing a relationship, the first sexual activity between A.B. and GUIRLANDO happened in GUIRLANDO's vehicle at an unknown location, after

GUIRLANDO arrived to Arkansas to pick up A.B.  A.B. described a time line leading agents to conclude that she was 15 years old at the time.  During the course of the interview, A.B. stated she and GUIRLANDO had engaged in sexual intercourse and oral sex.  A.B. further stated GURIALNDO would utilize a condom during sexual intercourse.

23.     On two separate occasions, A.B. stated she and GUIRLANDO met at a hotel in Warren, Arkansas.  A.B. stated she believed that she and GUIRLANDO had discussed their desire to engage in sexual intercourse, prior to meeting at the hotel but was unsure of the exact communication platform utilized. A.B. stated she and GUIRLANDO engaged in sexual intercourse at the hotel and that GUIRLANDO utilized a condom during the sexual intercourse. A.B. also advised she and GUIRLANDO had also engaged in sexual intercourse at her father's residence in Warren, Arkansas.

24.     A.B. advised she and GUIRLANDO would utilize their phones to take pictures of each other.  A.B. advised that an example of those pictures was a "selfie" she said was taken at the hotel in Warren, Arkansas.  The picture, which I saw on one of the iPhones used by A.B., depicted A.B. and Guirlando standing in front of a mirror using white towels to cover their private parts.  GUIRLANDO also took a selfie picture of himself with A.B. sitting in a car seat, not wearing a bra and attempting to cover her breast.  I also observed that photograph on one of the iPhones used by A.B.  A.B. advised she also sent GUIRLANDO nude videos via Snapchat. A.B. stated she provided GUIRLANDO with the password to her Snapchat account so GUIRLANDO would be able to access the videos. A.B. and GUIRLANDO exchanged photographs via text message also. When shown partially nude photographs of herself, found on her iPhone, A.B. advised GUIRLANDO took photographs of A.B. with his cellular device and that A.B. also took photographs with her cellular device.  I observed these photographs to consist

of both A.B. and GUIRLANDO fully nude, partially nude and clothed. A.B. said these photographs were shared between A.B. and GUIRLANDO via text message and other social media platforms. FBI Child/Adolescent Forensic Interviewer Janette Michaels showed A.B. the nude photograph depicting A.B. standing in a shower, wearing a sports bra and no panties, with blood flowing from the vaginal area. A.B. acknowledged the picture was of herself and that she sent it to GUIRLANDO. A.B. was also shown a video recovered from her iPhone, which shows A.B. fully nude and standing in front of a mirror, revealing her entire body. A.B. stated she sent it to GUIRLANDO via the Marco Polo application.

25.    A.B. advised she and GUIRLANDO continuously shared their location via their cellular phones. The two also shared each other's cellular phone passcodes and social media account passwords.

26.    On one of the iPhones utilized by A.B., I observed emails sent via Twitter to A.B.'s email account. Some of these emails contain the content of Direct Messages sent to A.B.'s Twitter account by the user of another Twitter account bearing the unique username "@marcoguirlando." These messages indicate that GUIRLANDO was concerned his relationship with A.B. was being investigated by police, and directing A.B. to lie to investigators.

27.    Among the emails on A.B.'s iPhone described in the preceding paragraph, I also observed that GUIRLANDO sent A.B. a Twitter Direct Message on February 5, 2018 (approximately two weeks before he was arrested and the DEVICE was seized) indicating that he was changing his phone number and would provide A.B. a new number. Furthermore, GUIRLANDO sent A.B. a Twitter Direct Message on February 6, 2018 that stated, "I've never gotten another hotel room except to see you I promise." I also observed GUIRLANDO sent A.B. a Twitter Direct Message on February 7, 2018 that stated, "Make sure to never admit to

anything. I was reading about this online last night and reading lawyers advice. Just deny everything under every circumstance. No sex, no sexual pictures, no texting."

28.     On April 4, 2018, a search warrant was issued by United States Magistrate Judge Barry Bryant, of the Western District of Arkansas, authorizing the search of the DEVICE.

29.     On April 4, 2018, a forensic analysis report was extracted from the external SIM card of the DEVICE. The DEVICE was passcode protected preventing a forensic analysis report to be generated. A request for the passcode recovery of the DEVICE was sent to the FBI-Operational Technology Division (OTD).

30.     On approximately May 21, 2018, the request from the FBI-Little Rock Division to the FBI-OTD, for the passcode recovery of the DEVICE, was received. The DEVICE was later forwarded to the FBI-OTD for analysis. The FBI-OTD recovered the passcode of the DEVICE and returned the cellular device to the FBI-Little Rock Division for further analysis.

31.     On June 26, 2018, the FBI Little Rock Division Computer Analysis Response Team (CART) extracted a forensic analysis report from the DEVICE.

32.     A subsequent review of the forensic analysis report revealed a section labeled "User Accounts." The report revealed that the Apple ID marcoguirlando@icloud.com, as well as a Twitter account identified by the username "@marcoguirlando," have been accessed by the DEVICE.

33.     On July 12, 2018, I conducted an open-source online search of Twitter; specifically of the publicly accessible portions of the Twitter account bearing the username @marcoguirlando.   The search revealed that the most recent public post (referred to as a "Tweet") on that Twitter account's profile was submitted by the user on June 18, 2018.   The search also revealed a Tweet submitted by @marcoguirlando on November 20, 2017, which

contains multiple selfie pictures depicting A.B. and GUIRLANDO sitting in a vehicle and states, "Night rides with my baby by my side that's the best kind of time that I feel alive."  I also observed a Tweet submitted on November 23, 2017, which contains four pictures and states, "Some of the people I'm most thankful for […]."  One of those four pictures depicts A.B. sitting in a vehicle.  As of the date of this affidavit, the Tweets described in this paragraph still remain on the publicly accessible portions of the Twitter account bearing the username @marcoguirlando.

34.     Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users create and read short messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

35.     Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

36.     Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every

device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

37.     A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

38.     Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

39.     As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of fewer than a set number of characters.  Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (*i.e.*, a list of all "mentions" and "replies" for that username).

40.     Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

41.     Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location"

function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

42.     When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

43.     A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (*i.e.*, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

44.     In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

45.     Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the

user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

46.    Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

47.    Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

48.    If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

49.    In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

50.    As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account.  This

"user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

51. Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

52.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Twitter to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

53.     Based upon the foregoing, there is probable cause to believe that Twitter is in possession or control of information and content of the types described above, and others, relating to the Twitter account depicted and described in Attachment A, which includes evidence of violations of 18 U.S.C. § 2422(b) (persuasion, inducement, enticement or coercion), 18 U.S.C. §§ 2252A(a)(2) (receipt of child pornography), and 2252A(a)(5)(B) (possession of, or accessing, child pornography). Therefore, I respectfully request this Court to issue a warrant to search all content and information associated with the Twitter account depicted and described in Attachment A which is stored at premises owned, maintained, controlled, or operated by Twitter, and to seize the evidence, fruits, and instrumentalities described in Attachment B, which individually or collectively constitute the violations described above, or evidence thereof.

54.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A)). More specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

Robert Coleman
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on ___August 3,_____ , 2018

BARRY BRYANT
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information and content associated with the Twitter account **@marcoguirlando,** which is stored at premises owned, maintained, controlled, or operated by Twitter, Inc., a company headquartered in San Francisco, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Twitter**

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, including any messages, records, files, logs, or information that have been deleted but are still available to Twitter, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the government for each account listed in Attachment A:

    (a)    All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers;

    (b)    All past and current usernames, account passwords, and names associated with the account;

    (c)    The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

    (d)    All IP logs and other documents showing the IP address, date, and time of each login to the account;

    (e)    All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

    (f)    All "Tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those Tweets and Direct Messages;

(g)     All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (*i.e.*, "mentions" or "replies");

(h)     All photographs and images in the user gallery for the account;

(i)     All location data associated with the account, including all information collected by the "Tweet With Location" service;

(j)     All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

(k)     All data and information that has been deleted by the user;

(l)     A list of all of the people that the user follows on Twitter and all people who are following the user (*i.e.*, the user's "following" list and "followers" list);

(m)     A list of all users that the account has "unfollowed" or blocked;

(n)     All "lists" created by the account;

(o)     All information on the "Who to Follow" list for the account;

(p)     All privacy and account settings;

(q)     All records of Twitter searches performed by the account, including all past searches saved by the account;

(r)     All information about connections between the account and third-party websites and applications;

(s)     All records pertaining to communications between Twitter and any person regarding the user or the user's Twitter account, including contacts with support services, and all records of actions taken, including suspensions of the account.

## II.   Information to be seized by the government

A. All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2422(b) (persuasion, inducement, enticement or coercion), 18 U.S.C. §§ 2252A(a)(2) (receipt of child pornography), and 2252A(a)(5)(B) (possession of, or accessing, child pornography) involving MARCO GUIRLANDO **for the time period beginning June 1, 2017, and continuing through the date of this search warrant,** including, *but not limited to*, for the account identified on Attachment A, information pertaining to the following matters:

(a) Photographs and Videos sent and received, including deleted photographs and videos.

(b) Evidence indicating how and when the Twitter account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Twitter account owner;

(c) Evidence indicating the Twitter account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the account about matters relating to the posted threats.

B. Any and all Tweets made by the user(s) of the account described in Attachment A during the time period beginning on June 1, 2017, and continuing through the date of this search warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
## RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct.  I am employed by Twitter, Inc., and my official

title is _____.  I am a custodian of records for Twitter.  I state that

each of the records attached hereto is the original record or a true duplicate of the original record

in the custody of Twitter, and that I am the custodian of the attached records consisting of

_____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth, by, or from information transmitted by, a person with knowledge of those

matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity

of Twitter, Inc.; and

c.      such records were made by Twitter as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.

_____        _____
Date                                              Signature